May I please the court? Doug Beavers for Mr. Stagno. I will be discussing the jury instruction issue where the standard of review is in my favor. The First Amendment is violated if a jury convicts based on protected speech. In Virginia v. Black, the Supreme Court reversed the conviction where there was a mere possibility that a jury relied on the improper jury instruction to convict. Mr. Stagno's trial brief clearly advised the judge that he was raising a First Amendment defense and that he believed improper had to be narrowed to prevent the jury convicting for speech. The denial of his instructions permitted the jury to convict on that. In United States v. Margaret Pieda, the denial, this court held that the denial of a defense jury instruction warrants per se reversal if the defendant shows three things. Mr. Beavers, hold on. Isn't there plenty of evidence of the conduct itself to be? Not the words, but the conduct itself. That conduct was disputed. As to the sufficiency evidence, the government can sufficiently, the Rule 29, the government can rely on it. But under Margaret Pieda, all we have to show is that the instructions had some support in the evidence and that it was not. It seems to characterize this case as a withdrawal of a defense rather than as an inaccurate or inadequate is really not accurate. The instances, the erroneous defense or leaving out a defense have come up is when there was a specific affirmation that wasn't allowed to be made. The problem here is that the instructions were interesting and were arguably and I think that at least part of what you asked to be in there should have been in there to be, to tell the jury what the last phrase of the other instruction actually meant was naked. I mean, for one of the first minute, but I don't see this as denying it. Beautiful standing up and saying that he can't be convicted for the words he spoke under that particular provision. Well, I was allowed to say it, but I had no jury instruction. The jury instruction was your instruction of what otherwise improper language meant. And you say, and otherwise improper language has to be language that is a tantamount to fighting words. IE can't just be an expression of opinion. And that's probably right, but I don't see this as a defense. Well, it was, whether it's a defense or part of the charge, it was a jury instruction. And if the court had some support in the evidence and it was supported by the law. And so under Margaret Payita, it was not separate. There's not a separate analysis. If it's a jury instruction for an element or an attacking element or affirmative defense does usually come up in the affirmative defense context. I would stop and let my co-advocate speak. All right. You're having your 7.5 minutes, but that's fine. Go ahead. Yes, sir. Your honor, before I proceed, I think the host. Just a minute. You're not on the, we can't see you. Precisely. I've been blocked from starting my video by the host. Host, would you please let her start her video? All right. Okay. There you go. Thank you. Now there, Delaney. Thank you. Good afternoon, your honors. Delaney Gold Diamond representing amicus, the Pennsylvania center for the first amendment. We urge your honors to overturn the decision of the district court for two reasons. First final jury instruction number four was unconstitutional because it criminalized language based on its viewpoint and was vague in a way that lent itself to viewpoint discrimination. And second, the district court erred in denying mr. Stagnus proposed jury instruction number seven, which would have cured the constitutional defect of instruction. Number four, you've got air harmless. No, your honor, in order for the government to prevail on a theory of harmless error, they have the burden to prove beyond a reasonable doubt that mr. Stagna would have been convicted, even if the jury had been properly instructed. And this is a high burden that they can't meet here in the absence of a special verdict form. We don't know whether the jury convicted mr. Stagno precisely because of the improper language portion of the jury instruction and in street versus New York, the Supreme court struck down a conviction for flag burning when it was unclear from the record, whether the defendant was convicted for constitutionally protected speech or whether he was convicted for constitutionally unprotected speech. So where that ambiguity exists, it must be remanded for a new trial. Okay. Let's get into the instruction. The instruction that you asked for in the first paragraph said that improper language means language by its very utterance inflicts injury or tends to incite immediate breach of the peace, which is the terminology fighting words and, and perhaps I possibly correct. Okay. However, the mere use of racist insults is not considered improper language under this ordinance, less accompanied by other language, tending to incite a breach of the peace. But why not? I, that, that seems like an overstatement to me. Using what she, um, racist, um, insults at somebody, um, would meet the standard of inflicting injury or tending to incite immediate breach of the peace. Not necessarily your honor, because narrowly, but that's not what the instruction says. Well, in American freedom defense initiative versus King, this circuit held that restrictions on language that demean an individual or group are viewpoint-based restrictions. That means that even a restriction on racist speech in a VA hospital would still be a viewpoint-based restriction. Restriction on racist speech. Your strongest argument about, on the first point, the recent trademark case in the Supreme court. Is that what it's called? Yes. Um, I mean, that seems to me to be stretched in terms of what's viewpoint-based, but it seems really quite parallel and you're in pretty good shape on that, but it's not because it's racist as such. It's because it's improper or, or, or, uh, scandalous or whatever. In other words, there was nothing in this statute that specifically, unlike RAV, that specifically holds racist speech as such. Your honor, we agree that we're not dealing with a restriction on racist speech. However, that second portion of the jury instruction that your honor read does have a basis in law because racist speech is not enough for the speech to be considered a fighting word for it to be unprotected under the constitution. We also know that from, that's the whole point though. I mean, wasn't just the speech, right? It was the, the way in which he was conducting himself. It was the manner in which he was conducting himself, getting in his, in one of the security officers face yelling, uh, in, uh, again, the manner and the circumstance in which he was conducting himself that in conjunction with the speech of what was being criminalized. Wasn't it? No, your honor, because Mr. Stagner was actually acquitted on the disorderly conduct charge. This circuit in United States versus Pucha found that the fighting was, but on the, um, oh, my apologies, the assault charge on the assault charge. And it was a specific assault charge with regard to this particular woman who was standing in the doorway, but he wasn't acquitted, uh, of, uh, making threats or otherwise, um, in contact that would have been disorderly conduct. Yes, your honors are correct. However, other circuits have interpreted disorderly conduct statutes to restrict the words prohibited only to fighting words. An example of that is United States versus Pucha. I have a problem with that. I, what I'm questioning, and then I want to know what happens if I'm right about it is the second sentence. Um, not the first sentence. Um, suppose I'm right about that, uh, as a procedural matter, uh, I assume that the, the fact that you may have asked for more than you're entitled to, it doesn't mean that you whatever part of it is you are entitled to. Is that right? In other words, if I thought you were entitled to the first sentence, but not the second, um, I assume that, that that's a sufficient objection or, or wait, cause there's no waiver. Is that right? Your honor, removing that second portion of the jury instruction would not be, would not be fatal. It would still have allowed the jury to consider a first amendment defense to, to Mr. Stagno's conduct. However, the standard for reviewing the language of the injury instruction is, is DeNovo, whether it has a basis in law and it does have a basis in law United States versus Pucha and under American defense initiative, which says that language that demeans an individual or group is viewpoint is viewpoint based. And because of viewpoint based restrictions, that, that turns on whether you're demeaning an individual group, that's the problem. It turns on whether it's improper, otherwise improper language. And as I say, I think you're in relatively good stead because the Supreme court in Enoch, Enoch thought that that was that scandalous and so on was, was viewpoint. So that's okay, but it's not exactly what it was about. That's, that's in the statute. Your honor, I think I understand the heart of the problem here. And, and this is what it is because the language of the jury instruction, the otherwise improper language portion was, was so, was so vague. The issue is that if the jurors had found that the use of the racist epithet was inherently disturbing, if they thought that the mere utterance of that word was a disturbance, the jury instructions as, as provided to them would have allowed them to convict for the use of that epithet alone. And if they convicted on the use of that epithet alone, that would be a viewpoint, discriminatory application of the instruction under Pooja and under American defense initiative. So we agree that this isn't a regulation on racist speech, but if the jurors applied it as a regulation of racist speech, that would be an unconstitutional viewpoint-based regulation. Well, it's hard to imagine a disturbance that doesn't involve some kind of speech. So it seems I'm having some problem with, with the limits to your argument that the jury could have, could have said that the disturbance was solely the speech. Your honor, the instruction as provided required the jurors to determine two things. First, was the speech otherwise improper? And second, did that otherwise improper speech tend to cause a disturbance? And it's that first portion of the analysis was the speech improper that requires, that is a viewpoint discriminatory application. In order, in order for that to be a viewpoint neutral restriction, we could look to the loud, we could look to the loud portion, portion of the jury instruction. The issue is that because improper is both facially viewpoint discriminatory, but it also allows for viewpoint discriminatory application. That first portion of their analysis is viewpoint discrimination, regardless of whether they then perform the second element. Did it actually cause a disturbance or not? I'm running out of time, but that's fine. Let's go on because it's really interesting. You're doing a terrific job, by the way. So the question of whether the... You agree, as I understand it, although you're a lawyer for the defendant seems to contest this, that the Chapman standard, harm zero standard applies. Yes. So if the jury instructions had a basis in law, which this court reviews de novo, and if they had a basis in fact, which this court reviews for abuse of discretion, that under Marguerite Pallado requires it's per se reversal. So after those first two analyses are performed, the case must be reversed. That's a standard that applies rather than a simple challenge to the jury instructions as inadequately stating the law. It doesn't seem to me that this is a question of precluding the defense. Stating the law in a way that doesn't include all the possible limitations and therefore is an inadequate statement of the law. And that harmless error, even though despite the first remaining contents should apply. So if we can assume that for a minute, and this is the question of the judge player, why, given everything that occurred here, a lot of which included contact, threatening people, getting in the face of the security guard, yelling, screaming, and so on. Why wouldn't a Chapman standard be met? Your Honor, I have two responses to that question. First, Mr. Stagno testified in his own defense, and the only evidence that went undisputed between his testimony and the testimony of the other witnesses was that he used the racial epithet. And moreover, he got into the face of the security guard and he said that he told this guy inside that he was going to come outside and he'd fight with him. And he said that he came, he wrapped his bicycle cable around his arm and gave people the finger. And if you're going to talk about fighting words, maybe that would meet that and probably would. And so it seems to me there's plenty that we did not dispute. Your Honor, I'm sure that Mr. Beavers would be able to speak better to the details of the record in that regard, but it was our understanding that when Mr. Stagno testified, he admitted that he used that he used disrespectful language and denied the other accusations. The fact that the jury acquitted him of the assault charge, and then the other fact that the jury also gave a communication to the judge after they convicted him on the disorderly condo charge, that they had convicted him on that charge with some reluctance because they thought that the fact that he was being prosecuted was more a failing of the VA and less is failing on his own part would go to rebut that. And moreover, the language of Margaret Pallotta was clear, but Mr. Stagno had a constitutional right to have the jury instructed on his theory of the case, which was a first amendment theory, as long as that instruction was supported by the law. And whether that instruction was supported by the law is up for this court to determine de novo. And it is supported by the law under Chaplinsky versus New Hampshire, you know, and the United States versus Pucha, which was decided quite recently in this circuit. Okay, thank you very, very much for many, many minutes over. And we'll add some time to. So Mr. R2s, I think you're next. And why don't we make it 20 minutes instead of? You don't need to use it. Good afternoon, Your Honors. Robert R2s appearing on behalf of the United States. May it please the court. Now, many of the appellants arguments here are trying very hard to be a facial challenge to this regulation. Well, no, they're not. They're being a facial challenge to a jury instruction. A jury instruction happened to come out of the statute, but they're not contesting the statute. Yes, Your Honor, as the court points out, this appeal is about the adequacy of the jury instructions, whether they were correct under the law and adequate to guide the jury's deliberation in this case. And they were, and they also permitted defendant, Mr. Stagno to argue to the jury that what statements he made and the conduct that he engaged in at the VA facility was something not covered by the regulation. And in fact, that's what he did argue in closing was that his conduct was limited to verbal insults, racial epithets, and that it did not, in fact, tend to disturb the operation of the clinic. And that's a misrepresentation of the record because as the court points out, there's ample evidence in the record about Mr. Stagno's conduct at that VA facility, including- Hold on, Mr. Ortiz. In closing, the prosecutor said, quote, you heard the words, you heard the words the defendant was using that day. You heard the racial terms that were used. Isn't that punishing the viewpoint? You're saying we should find him because he used the N word. No, your honor. Although that, although that statement was made in closing, the jury instruction did not focus on any content specific language. But what about the Yankee? I understand that it didn't focus on the racial nature of the speech, but the phrase otherwise improper language is extremely similar to the phrase that was found to be a viewpoint discriminatory in the Yankee, no? Well, I would add, your honor, that that particular language, and as the Supreme Court instructs, when we look at jury instructions, we don't look at words in isolation. We don't look at phrases in isolation. We look at them in the instructions as a whole. What they focus on is not the content of the language itself, but the effect it had on the facility. Did it impede the duties of the staff at that facility? Did it prevent patients from getting appropriate care at that facility? Those were other subsections, but this subsection says something like tends to disrupt, but it's something much vaguer than that. Yes, but again, we must look at, we can't look at just that one phrase in isolation. Supreme Court instructs that we have to look at the instructions as a whole, and even what was argued in the trial, in the trial record. And what was argued in the trial record was not just looking at this phrase improper language. It's looking at the defendant's conduct as a whole, his conduct in threatening people to fight, spitting in people's faces, his racial epithets. And I do argue that. I'm sorry, that's a harmless error argument seems to me. But if they, what they, under the instruction have given, has given, have convicted him just for, you know, being rude and nasty and using racial epithets. I mean, let's leave out the racial epithets. Using derogatory statements about black people, leaving out the epithets. Couldn't they convict him of that? Absolutely, your honor. And I think what's being glossed over here by the defense is that they cite a lot of cases about this broad language. And all those cases are talking about ordinances and regulations in public forum. This here, it was a non-public forum. It was a VA facility. There's no dispute here that this is a non-public forum. I'm really feeling we're going out of the circle. It can't be viewpoint discrimination. Tell me why Ian does not lead to the conclusion that otherwise improper language is itself viewpoint discrimination. Because otherwise. Less limited to essentially fighting words. Because the improper language is tied to the phrase that tends to disturb the normal operation in the clinic. And this court has reviewed similar language in other cases. For example, the Zabel case and the Efron case, that just like the word improper language appears in that portion of the regulation, there's also the word unusual noise. Unusual noise could just as equally be vague or ambiguous if looked at in isolation. And this court has found, at least in the context of a vagueness challenge, that it was not vague and that it properly put the public on notice what that regulation meant. And the same is true here. And also in the course decision in CMAQ versus King County, the court reviewed the language of material that is intended to disturb. How much it has to be likely to disturb. Yes. And also in this, in the course decision in CMAQ versus King County, the court reviewed the constitutionality of the language or an ordinance that material that is so objectionable as to be reasonably foreseeable that it will result in the disruption of the transportation. It will result in a disruption, unlike tends to. That's different. Well, the jury instruction also requires your honor, the jury instruction requires in the first sentence of the preamble, it says the defendant created a disturbance at the clinic by doing at least one of the following. So what's, what was required by this jury instruction and what's required by the regulation itself is that it, that a disturbance was actually caused by the defendant's conduct and the prohibitions that are listed there. One of which number five is use of loud, abusive, or otherwise improper language that tends to disturb the normal operation of the clinic. And if we looked at that phrase, the full context of the instruction and the trial record, what, what the jury was told is they're looking at language, not, not anything specific to somebody's race or gender or political views, but looking at language that is so, so extreme or persistent or annoying to the staff that it prevented, for example, the patients from getting proper care, it tended to disturb the normal operation of the clinic. And that's exactly what happened in this case. We had somebody that did much more than, than shout racial epithets and insult somebody. We had somebody challenged people to a fight, including the security guard outside and also a patient in the lobby. And, and the witnesses in this case were so terrified. They had to patients out of the lobby and shut down the clinic for a good portion of the day, all because of this defendant's conduct. And that, that conduct fits very, very well with the language of the regulation. And there's nothing viewpoint neutral about instructing the jury to look at what was improper language in this context, in this venue, a public, a non-public forum where you have VA patients that are there expecting a calm environment. That number five was not in the jury instruction at all. I was the trial counsel in this case, your honor. And I argued that the defendant's conduct met all of these prohibitions. And it in fact did meet all of these prohibitions. Now we don't know what jury specifically relied on. We meet and it's still deliberations, but what we do know in a goal 29 context is that there's more than sufficient evidence to support the jury's verdict under any one of these prohibitions, because he did all of these things. He crowded, created an allowed unusual noise. He obstructed the entrances because it had to be shut down because of his bad conduct and impeded the performance of the duties because they couldn't treat any patients because they were dealing with this person with this very erratic behavior. And they were afraid for their lives to an extent that they had to call 9-1-1 and the police had to arrive. So all of these prohibitions were met by this defendant's conduct. Yeah. Let me, I just wanted to make sure this was crafted since you were the trial counsel, this was crafted to follow the regulation. Is that correct? It was crafted to follow the regulation and to follow this court's decision and us for peace able where the court specifically looked at the phrase tends to disturb normal operation clinic. And in fact, in crafting these jury instructions, this was, this was an agreed upon instruction between both the government and the defense. This, this was not objected to during trial, but the defense wanted was to add some additional supplemental instructions that are wrong as a matter of law. Because your honor, for example, instruction number seven, which calls for, which defines improper language as a means, uh, which by its very utterance inflicts injury or tends to incite immediate breach of the peace. That's, that's from our ID case talking about fighting words. And in that case, the court was looking at a city ordering ordinance. You're not, have you looked at the ankle case? Have you read it? Yes, your honor. Okay. Can you tell me why it doesn't make this viewpoint discriminatory and less limited? Let's leave it. I understand your argument about there's other language in here, but as to the definition of what otherwise, um, improper languages, why? Because this language is written for a regulation of ordinance in a public forum. And that's, that's what the appropriate language is for that forum. That's not a, that's not the right language for a non-public forum. Yanko was a public forum. Well, I don't see how it could be a non-public forum because it certainly wasn't the conclusion is that it was viewpoint discriminatory. And if it's viewpoint, then it can't be done either in a public forum or in a non-public forum. The issue there was whether it was viewpoint discriminatory. So I need you to tell me why isn't controlling because the, because the, the, the regulation, the language in the regulation, which largely mirrors what's in the jury instruction does not call out, does not, it's not include any specific language that calls out gender bias, race, political views, demeaning language, the language that was said to be viewpoint. I have a real problem with this. I'm not sure it's right, but this is what they said was immoral and scandalous. That was viewpoint discriminatory. Well, what I can say, your honor, is in order to distinguish that case, again, I'm sorry, I should say in order to distinguish that case is that, is that we're talking about a jury instruction here and relying on Kopp versus Naughton and his progeny. We're not looking at that, that language in isolation and in trademark setting, you are in trademark. You're talking about one phrase in isolation. All right. And this is, that's not what we're talking about here. We're talking about a jury instruction. That's many words long. And we're talking about a trial record that put those words into context. And that's how I distinguish that case. Well, they aren't challenging the regulate the constitutionality of the regulation. That's correct. Your honor, what they are challenging, they're challenging the jury instruction. They're also challenging. They're making this, this rule 29 argument and suggesting that the regulation was unconstitutional as applied, which is also not true. And just to reiterate my point on the phrase here, if you look at that phrase in its full context, a reasonable jury would not be compelled to apply a viewpoint specific standard. There's nothing, there's no evidence to support that in this particular context. Well, counsel, again, I go back to the closing argument. The closing argument focuses on, on those words and your honor in this, in this particular forum, in a non-public forum, such as this, it is very, it is proper. And it's constitutional for regulation to enter in a broad context to, to preclude many types of language, including racial slurs. For example, if, if, if a person goes into a VA clinic and shouts the N-word over and over and over again, that would be the definition that they asked for. And yes, you're right. But suppose instead what he had said is you know, I really don't like black people and I don't want to, I don't want, I want a different person behind to deal with me because I don't like black people. Well, according to the jury instruction, if the jury was charged with whether that was improper language in the full context of the instruction that tended to serve a normal operating room. I don't know that that's, that's, that's, that's appropriate. Even though I guess we all have great sympathy with the notion that you shouldn't be saying that. I think I agree with your honor that if that's, if that, those are the factors to this case that, that this, this regulation would not apply, but that, that those are not the facts of this case. This person did much more than improper. I mean, it seems pretty improper to me. I certainly think that's improper. Well, I would again, point your honor to, to, to this court's decision in CMAQ, where it used the phrase, an ordinance that used the phrase objectionable. And, and the court, this court found that that particular phrase was not before the CMAQ case, you know, which as I say, I find, you know, a little over the top in terms of what's viewpoint discrimination, but that's what it said. I'm sorry, your honor, that that's what what's the CMAQ case and the ZABO case or ENAQA after RIV, right? Yes. Again, I don't see how, how they're inconsistent though. I don't see how in the context of regulation that's applies to a VA facility, medical facility, how, how that's, how that would be similar to the cases you cited. Again, the court must look at the viewpoint, whether it's viewpoint neutral and also whether it's reasonable in light of the purpose of the regulation in the form. Yes, it does have, it does, does have to be both. However, your honor, I, I won't repeat my argument again, as you know, with respect to the Cup versus Naughton, but again, main argument here is that it's different in that we're talking about a jury instruction and the standard is very different when you're talking about a jury instruction versus a facial challenge or a unconstitutional as applied challenge. I believe my time is almost up and, and I would like to turn quickly. I want to argue very briefly about why, if this were improper, at least the first sentence should have been given. It was harmless error, which I assume you would say there was. A, just the harmless error standard apply and B, why was it harmless beyond a reasonable doubt? It was, it was harmless error, your honor, because even if the court had adopted these instructions, which, which are incorrect as a matter of law, if the courts had adopted these instructions, it would still, his conduct, the defendant's conduct would still meet the language because what he did, what did in fact, by its very utterance tend to incite an immediate breach of the peace. That's what, that's what this was all about. It was about challenging somebody to a fight. That, that's pretty much the perfect definition of, of an imminent breach of the peace. When he challenged the fight, the person outside? He challenged the person. Yes, your honor. I, I, I was the attorney that cross-examined the defendant and he admitted, as argued on page six of the brief, that he went outside, he got into the guard's face, yelled at him in his face, he called him a pussy, and then he challenged him to a fight. He admitted that on cross-examination. And on top of that, he challenged a, a patient to a fight in the lobby in the same, in the same general timeframe. And this caused such a disturbance that the patients had to be escorted out. They couldn't get the medical treatment that they were there to receive. And, and the staff had to call 911 because they were terrified for their safety. And that was certainly. The, the, the, the problem is we don't know what the jury would have done, right? Because on the one hand we talked about, you know, the improper language, but then we say in closing that you, you, that we heard what the, what the defendant said, all these racial epithets. That's right. And it wasn't, it wasn't necessarily the content. I wasn't, I wasn't focusing the jury on the content. It was, it was conduct in its totality. And yes, there were racial epithets, but it was the racial epithets being repeated over and over and over again in a very angry manner, in a very, you know, a very attacking matter, verbal attacking matter. And that, that was what was called a positive disturbance. I didn't argue in closing that you should convict the defendant just because he said a racial stuff. That was not what was argued. It was the conduct in its totality, the physical conduct and the verbal conduct. Is it possible, is it possible though, the jury could have construed what you said differently? It's possible, but I don't see why I'm not aware of any standard that requires the court to speculate that the jury could have, could have found, made their decision. If the instruction was improper, the burden is on you to prove that beyond a reasonable doubt they didn't. Right. Yes. And, and, and I've, I've mentioned that the instruction, there's nothing in the instruction that tells the jury to focus on, on the specific content of the message. It tells the jury to focus on the effect, what the effect was of the message, the verbal attacks that this defendant was displaying. That's what the instruction says. That's what was argued in closing and all throughout trial. There's no, there's no evidence here that the jury was told to just think about a racial tolerance. That's the farthest from the truth. The court, the government spent a lot of time, numerous witnesses testified about how terrified they were, not because he used the N word, but because he was threatening their safety. That's what this trial was about. And that's why the jury came to the right decision. And that's why the jury acquitted him on the assault. And the jury said that they didn't really want to put him on a just contract either. Which gives you some question about what they would have done with a more specific instruction. Their time is just better. Your time is better. Thank you very much. Thank you. I think you have a little time. I'm not sure. Do you have some time? What's that 931? He doesn't have 931 time. Originally we had, I'm sorry. Uh, yes, I was going to say we had put seven and a half on it and then it had went over nine and a half. So it's a total of nine and a half. Correct. He only went. Why does he have left on his seven and a half? He had only, uh, around three and a half minutes. Okay. So three and a half minutes. Can you put that on the clock? Yes, ma'am. Yes, Mr. Beam. Can you hear? Okay. Your Honor, I think the most, you raised the issue about whether my, the instruction could be sliced out and only one sentence. I think in many times instructions raise multiple definitions in a single proposal. If only one part is right, uh, that still should be the same error. It's otherwise we would have hundreds of pages of jury instruction. And this was a petty offense that had never had no pattern instructions. We're trying to guess at what the first amendment law by the uncle comes out after. Um, and I think wait a minute. We don't have judge Schroeder. I don't know what happened to him. I, uh, I've I don't know. What should we do? Uh, just go ahead. I can hear you. Okay. I'll be fast. Uh, so I would ask the court to reverse, even if just the one sentence is wrong. I think that there's in a, in a case where there are no prior cases of dealing with the jury instruction, the case is not normally jury eligible. It's a how to propose jury instructions on this complicated first amendment. It was a jury trial by convenience because it was combined part of the same transaction with the, with the class a misdemeanor assault. Um, and, um, but also because of the change in law afterwards, I think that also, uh, suggests that if the jury had been correctly instructed under the, uh, the correct language out of the uncle, uh, it would not have been harmless because, for the main reason that the, although there was evidence on many of the forms of the disorderly He did agree that he was a bit loud, that he was disrespectful that he used the N word a couple of times. Uh, but loud within the context of a mental hospital is very vague. It's hard to tell what that means in Zabo. The jury was, it was clear. He was yelling at the top of his lungs is what the court cited, uh, that he called, uh, that he, he, um, he said, I'm going to What about the language in the instruction, which is not in the statute, uh, about that he had to create a disturbance at the beginning. And at the end tends to create a disturbance. Why don't those, does that save the, um, the, the, the instruction? No, because those are two separate prongs. The, the problem with is the language is improper is just whether is the viewpoint discrimination and likely to cause a disturbance is a separate issue. If it's viewpoint discrimination on one prong, uh, it's saved by merely that it tends to cause a disturbance because that's also subjective. And that is, um, that, uh, because it's based on the subjective interpretation of the, uh, the person hearing. Okay. Your time is up. Thank you very much. I want to particularly thank Ms. Gold Diamond and her mentor, Mr. Volokh, uh, as a law student, uh, did an exceptionally good job. Good job. Thank you. Do you want to submit the Abood case too, as well for the record? Last case, uh, there was one case that was submitted, uh, on the briefs, uh, that was thank you very much.
judges: Schroeder, Berzon, Mendoza